**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
DORSET INDUSTRIES, INC.,

                    Plaintiff,

          -against-

UNIFIED GROCERS, INC.,

                    Defendant.
-----------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
11-CV-6337(ADS)(GRB)

<u>**APPEARANCES:**</u>

**MEYER, SUOZZI, ENGLISH & KLEIN, P.C.**
*Attorneys for the plaintiffs*
990 Stewart Avenue
Suite 300
Garden City, NY 11530
      By: Erica Garay, Esq., & Lynn M. Brown, Esq., Of Counsel

**REICH & PAOLELLA LLP**
*Attorneys for the defendants*
140 Broadway, 46th Floor
New York, NY 10005-1108
    By:  James D. Reich, Esq., Of Counsel

**SPATT, District Judge**.

      This case arises from a commercial dispute between Dorset Industries, Inc. ("Dorset" or

"the Plaintiff") and Unified Grocers, Inc. ("Unified" or "the Defendant").  Presently before the

Court is a motion by the Defendant to dismiss the complaint in its entirety pursuant to Federal

Rule of Civil Procedure 12(b)(6) for failure to state a claim.  For the reasons set forth below, the

Defendant's motion is granted in part and denied in part.

# I.  BACKGROUND

The following facts are drawn from the complaint and the documents incorporated by reference in the complaint.  As required on a motion to dismiss, the Court construes the facts in the light most favorable to the Plaintiff.

## A.  The Parties and the Initial Relationship

Dorset is a Delaware corporation based in Albertson, New York, which is in the business of manufacturing merchandising equipment and providing certain marketing and merchandising services in connection with the development and implementation of merchandising programs known as "checkout programs".  Unified is a California corporation, and is a cooperative that is owned by its member grocers, which are independent grocery retailers.  In addition to allegedly being one of the largest retailer-owned grocery cooperative in the Western United States, Unified is allegedly the largest wholesale grocery distributor in the Western United States, selling goods to both its own members and other retailers.

In or about 2000, Dorset alleges that Unified requested that Dorset create and develop a checkout program for Unified's members, using Dorset's "know-how, experience and intellectual property" ("the Program" or "the Dorset Program").  (Compl., ¶ 6.)  Subsequently, the parties entered into an agreement to effectuate the Program.

The business model was as follows:  Dorset, as "the Supplier", agreed to plan and design checkout display units that retail grocers, or "Customers", would place at or near the cash registers or checkout counters.  (Compl., ¶ 8.)  In addition, Dorset would enter into agreements with manufacturers or "Participants", who would lease space in the displays.  (Compl., ¶ 8.)  The Participants were manufacturers or distributors of beverages, magazines, candy, general merchandise, health and beauty care products, snack foods, and other products.  (Compl., ¶ 8.)

2

In turn, Unified, "the Wholesaler", entered into contracts with the retailer, prepared by Dorset, that governed the retailers participation in the Program ("subscription agreements"). (Compl., ¶ 8.) Unified would then sell and distribute the products manufactured by the "Participants" to each member grocer who participates in this Program. (Compl., ¶ 8.)

Although Dorset claims that it generally dealt directly with Unified's member grocers, Dorset alleges that it agreed to create the Program for Unified based on the agreement that Unified would "solicit its member grocers to join the Program and Dorset and Unified would share the income stream". (Compl., ¶ 9.) According to Dorset, the Program "gave Unified a unique marketing tool at no cost, providing tremendous benefit to Unified and its member grocers, as they were able to utilize and maximize this retail space at the checkout counter to generate revenues and profits through their participation in the Program, and to maximize sales by Unified." (Compl., ¶ 12.)

The parties operated under this initial agreement until 2006, when they entered into two agreements that modified the Program, which are the subject of the instant litigation.

## B. The New Installation Agreement and the Extension Agreement

According to Dorset, the Program had two parts: a New Installation Program and an Extension Program. (Compl., ¶ 13.) On April 25, 2006, Unified and Dorset modified the terms of the Program through two related contracts: a New Installation Program Agreement ("New Installation Agreement" or "NIPA") (Compl., Ex. 1), and an Extension Program Agreement ("Extension Agreement" or "EPA") (Compl., Ex. 2) (collectively "the Agreements").

Under the New Installation Agreement, each participating grocer would be placed into the Program for a three-year period and would enter into a subscription agreement with Unified. (Compl., ¶ 14.) Dorset, as the "exclusive manufacturer" for the Program, (NIPA, ¶ 19), would

design and manufacture each unit for a particular grocer, and Unified would install those units at the grocers various stores. Under the New Installation Agreement, Dorset would pay Unified a "per unit allowance" for each installation. (NIPA, ¶ 6) In turn, Dorset had the exclusive right to solicit and enter into contracts with the distributors or manufacturers of the goods displayed on the checkout display units. (NIPA, ¶ 5.) Dorset would then enter into contracts with the manufacturers where the manufacturer agreed to pay Dorset "rent" to have its goods displayed and retailed in the units. (Compl., ¶ 15.)

At the end of the three-year subscription, Dorset alleges that Unified was responsible for identifying participating grocers and signing them up for the Extension Program, which had a one-year term. (Compl., ¶ 16.) The terms of the Extension Program were governed by the Extension Agreement. (Compl., Ex. 2) The purpose of the Extension Program was for Dorset to continue providing services to Unified's member grocers after the initial 3-year period. Under the Extension Program, Unified received 66% of the "rent" owed to Dorset by the manufacturers, thereby providing an incentive to Unified to encourage its member grocers to participate in the initial New Installation Program and the Extension Program. (Compl., ¶ 17.) The Extension Agreement requires Dorset to develop a "modified" checkout program for the Unified grocers who were enrolled in the Extension Program. (EPA, ¶ 1(c).)

On June 2, 2008, Unified and Dorset entered into an "Addendum" to the Extension Agreement. The Addendum provides that the Term of the Extension Agreement "commencing as of April 25, 2007 and continuing thereafter (a) for so long as there is any agreement in force by and between [Unified] and any Customer [ie., the grocers]…operating under this Agreement plus (b) an additional six (6) months after such time that there is no longer any such agreement in force by and between [Unified] and any such customer." (Compl., Ex. 2.)

Both the New Installation Agreement and the Extension Agreement contained Confidentiality and Non-Disclosure Provisions, whereby both Unified and Dorset mutually agreed not to use or divulge confidential information obtained through their participation in the Program.  (NIPA, ¶ 21; EPA, ¶ 14.)

## C.  The Termination of the Relationship

In late 2010, a dispute arose between the parties over the terms of and the expectations under the Agreements.  Specifically, the parties disagreed with respect to whether Unified could enroll a new grocer, referred to as "Cardenas #20" directly into the Extension Program rather than the New Installation Program by utilizing "used" racks that Unified had in storage.  According to Dorset, Unified's attempt to enroll Cardenas #20 into the Extension Program constituted a breach of the Agreements, depriving Dorset of a three-year New Installation Program customer whose revenue would flow to Dorset.

Although Dorset alleges that the parties initially agreed that Cardenas #20 would be placed in the New Installation Program, Dorset contends that, on February 16, 2011, Unified retracted its view of Cardenas #20 as a New Installation customer.  According to Dorset, Unified "recognized that if it stopped *sharing* the 'rental' revenue stream with Dorset, it could keep even more revenue for itself, and that it could accomplish this by cutting Dorset out of the Program".  (Compl., ¶ 63 (emphasis in original).)

On February 20, 2011 Unified advised Dorset by email that it was "terminating both our New Installation Program and Extension Agreements effective immediately" and that Unified intended to follow up and give Dorset "official Notice" of the termination pursuant to the notice requirements in the Agreements ("the February Notice"). (Compl., Ex. 5.)  The "notice provisions" of the Agreements stated as follows:

> Notices. For the purpose of this Agreement, any notices and demands required to be given shall be given to the parties in writing and by Certified Mail, return receipt requested, or reliable overnight courier at the addresses set forth above, or to such other addresses as the parties may hereafter substitute by written notice.

(NIPA, ¶ 26; EPA, ¶ 18.)

On March 9, 2011 Dorset contends that Unified advised Dorset that Unified had been having internal discussions "'for a long time' concerning 'taking the Program –in-house,' because Unified realized 'how much money Dorset was getting.' " (Compl., ¶ 74.) Dorset further alleges that Unified's representative stated that it had recruited its own team to handle the Program without Dorset since "you've had a good run[,] [w]e just want to take it over now." (Id.) On April 7, 2011, Unified's representative allegedly told Dorset that it was enrolling several customers in a "new" checkout program rather than into the Dorset New Installation Program. (Compl., ¶ 75.)

No new customers were added by Unified to the Extension Program in 2011. (Compl., ¶ 77.) According to Dorset, prior to 2011, there had been a steady addition of customers to the Extension Program averaging 24 locations per year. (Compl., ¶ 76.) At the same time, Unified ordered dozens of cases of supplies from Dorset to use for the alleged competitive program. (Compl., ¶ 92.) Specifically, Unified purchased 31 cases of supplies in February 2011, 20 cases in April, 40 cases in May 2011, and an additional 17 cases in June 2011. (Compl., ¶ 93.)

On August 29, 2011, Dorset provided Unified with a "Notice of Default", advising Unified that it was in material breach of the Agreements, with an opportunity to cure. (Compl., ¶ 95.) On October 10, 2011, Unified sent a second letter by mail to Dorset entitled "Notice of Termination of New Installation Agreement" notifying Dorset that the February 20, 2011 email terminated the New Installation Agreement, effective May 21, 2011 ("the October Notice").

(Compl., ¶ 97.)  To the extent that the February 20, 2011 email "was insufficient", Unified

stated that the October Notice "constitute[d] such notice and the [New Installation Agreement]

shall be deemed terminated on the date ninety days from the date of this letter".  (Compl., Ex.

10.)  The October Notice did not reference the termination of the Extension Agreement.  (Id.)

## D. The Instant Action

According to Dorset, before and after the purported termination of the Agreements,

Unified misappropriated Dorset's confidential information to create a competing checkout

program that it marketed to its member grocers, instead of the Dorset Program, in

violation of Unified's express and implied obligations under the Agreements.  As a result,

on November 22, 2011, Dorset commenced the present action against Unified in New

York State Court, which was subsequently removed to this Court based on diversity

jurisdiction.

Dorset alleges five causes of action against Unified.  First, Dorset seeks a

declaratory judgment that the New Installation Agreement and the Extension Agreement

were not effectively terminated by Unified, and therefore remain in full force and effect.

Dorset's second cause of action is based on Unified's alleged breach of the express

termination and confidentiality provisions of the contract as well as Unified's breach of

the implied covenant of good faith and fair dealing.  Finally, Dorset's third, fourth and

fifth causes of action are for breach of the confidentiality provisions, unfair competition,

and usurpation of corporate opportunities respectively.  They are based on Unified's

alleged misappropriation and use of Dorset's confidential information to create and market

to its customers a competing checkout program instead of the Dorset Program.  On

January 12, 2012, Unified filed the instant motion to dismiss the complaint in its entirety

pursuant to Fed. R. Civ. P. 12(b)(6).

## II. DISCUSSION

### A. Legal Standard

Under the now well-established <u>Twombly</u> standard, a complaint should be dismissed only

if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its

face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). The

Second Circuit has explained that, after <u>Twombly</u>, the Court's inquiry under Rule 12(b)(6) is

guided by two principles. <u>Harris v. Mills</u>, 572 F.3d 66 (2d Cir. 2009) (citing <u>Ashcroft v. Iqbal</u>,

556 U.S. 662, 129 S. Ct. 1937, 1949 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a

complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice.'" <u>Id.</u>

(quoting <u>Iqbal</u>, 129 S. Ct. at 1949). "'Second, only a complaint that states a plausible claim for

relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible

claim for relief will ... be a context–specific task that requires the reviewing court to draw on its

judicial experience and common sense.'" <u>Id.</u> (quoting <u>Iqbal</u>, 129 S. Ct. at 1950). Thus, "[w]hen

there are well-pleaded factual allegations, a court should assume their veracity and ... determine

whether they plausibly give rise to an entitlement of relief." <u>Iqbal</u>, 129 S. Ct. at 1950.

In considering a motion to dismiss, this Court accepts as true the factual allegations set

forth in the complaint and draws all reasonable inferences in the Plaintiffs' favor. <u>Zinermon v.</u>

<u>Burch</u>, 494 U.S. 113, 118, 110 S. Ct. 975, 979, 108 L. Ed. 2d 100 (1990); <u>In re NYSE Specialists</u>

<u>Secs. Litig.</u>, 503 F.3d 89, 91 (2d Cir. 2007). Only if this Court is satisfied that "the complaint

cannot state any set of facts that would entitle the plaintiff to relief" will it grant dismissal pursuant to Fed. R. Civ. P. 12(b)(6).  Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993). The issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001) (quoting Scheuer v Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

**B.  As to the Termination of the Agreements**

In this first cause of action, the Plaintiff seeks a declaratory judgment that the "New Installation Program and the Extension Agreement were not effectively terminated by Unified and, accordingly, each remains in full force and effect".  (Compl., ¶ 114.)  Similarly, in the second cause of action, the Plaintiff alleges that the Defendant breached the Agreements by failing to properly terminate them.  Both causes of action are premised on the same underlying allegations, namely, that:  (1) the February Notice did not effectively terminate either of the Agreements because it failed to comply with the writing requirements in the notice provisions and (2) the October Notice could not effectively terminate either of the Agreements because Unified was in default.

Where, as here, the same conduct underlies the Plaintiff's causes of action for declaratory judgment and breach of contract, courts generally dismiss the declaratory judgment claim as duplicative in favor of "the better or more effective remedy" of "the underlying litigation itself." Amusement Indus., Inc. v. Stern, 693 F. Supp. 2d 301, 311, 312 (S.D.N.Y. 2010); Fleisher v. Phoenix Life Ins. Co., No. 11-CV-8405, 2012 WL 1538357, at *11 (S.D.N.Y. May 02, 2012) ("Although Plaintiffs' declaratory judgment claim does not engender worries about 'procedural fencing' or 'friction between sovereign legal systems,' there exists nonetheless 'a better or more

effective remedy': resolution of the basic breach of contract claim. As discussed above, such resolution will answer the questions Plaintiffs raise in this claim, rendering [the declaratory judgment claim] subject to dismissal."); John Wiley & Sons, Inc. v. Visuals Unlimited, Inc., No. 11-CV-5453, 2011 WL 5245192, at *4 (S.D.N.Y. Nov. 2, 2011) ("When the traditional remedy provides the parties with the procedural safeguards required by the law to insure the availability of a proper remedy, the courts, in exercising their discretion, may properly dismiss the declaratory judgment action."); Sofi Classic S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006) (holding that to the extent a declaratory judgment claim "seeks resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action . . . the claim is duplicative in that it seeks no relief that is not implicitly sought in the other causes of action.").

Neither party addressed this issue; therefore, the Court will not dismiss the declaratory judgment action as duplicative at this stage of the litigation. However, the relevant inquiry is the same, namely, whether the Plaintiff has plausibly alleged that the February Notice and October Notice failed to properly terminate the Agreements. Accordingly, the Court addresses below whether the Plaintiff has stated a claim for a declaratory judgment and a breach of contract based on the alleged inadequacy of the February Notice and the October Notice.

**1. The February Notice**

There is no dispute that the February Notice, sent by the Defendant to the Plaintiff via email, did not comply with the notice provisions of the Agreements, which expressly state that all notices must be sent via "Certified Mail." Contrary to the Defendant's contention, the Plaintiff does not concede that it received "actual notice." As a general matter, formal notice

requirements set forth in commercial agreements are enforceable.  <u>See</u> <u>USI Ins. Servs. LLC v.</u> <u>Miner</u>, 801 F. Supp. 2d 175, 182 (S.D.N.Y. 2011).

Nevertheless, even assuming a notice by email could effectively terminate the Agreements, the Plaintiff plausibly alleges that it did not have "actual notice" of the termination.  To support this contention, the Plaintiff cites to the February Notice itself, which stated that "official Notice" would be forthcoming in subsequent communications.  (Compl., Ex. 5.)  In addition, the Plaintiff alleges that it received an email from the Defendant on March 22, 2011 advising it that Unified was "still reviewing [their] options relative to our discussion last week."  (Compl., ¶79.)  Drawing all inferences in favor of the Plaintiff, the Court cannot find that the February Notice was effective as a matter of law.

Accordingly, the Defendant's motion to dismiss the Plaintiff's declaratory judgment and breach of contract causes of action that are based on the allegation that the February Notice did not effectively terminate the Agreements is denied.

### 2.  The October Notice

The Plaintiff does not argue that the October Notice was technically defective.  Rather, the Plaintiff alleges that the October Notice was invalid because "by the time Unified sent its October 10, 2011 Notice, Unified had repudiated the Agreements and was a defaulting party, and, therefore, could not terminate the New Installation Agreement".  (Compl., ¶ 113.)  In this regard, the Plaintiff relies on paragraph 25 of the New Installation Agreement, which provides "that only a non-defaulting Party may, at its option terminate the Agreement" for cause ("the early termination provision").  (NIPA, ¶ 25.)

The Defendant argues that, not only does the early termination provision not contain any language preventing a party that is in default from terminating the New Installation Agreement,

but the October Notice invoked "termination of the agreement pursuant to paragraph 2 of the New Installation Agreement." (Compl., Ex. 10.) Paragraph 25 sets forth the conditions for early termination of the New Installation Agreement and paragraph 2 provides that the agreement "shall terminate upon ninety (90) days written Notice by either party to the other at any time after the third anniversary of [entry into the Program], unless sooner terminated as provided in Paragraph 25". (NIPA, ¶ 2.). Thus, the plain language of the New Installation Agreement appears to provide that, after the third anniversary of entry into the Program, the conditions for terminating the agreement are governed by paragraph 2, not paragraph 25.

The Plaintiff does not allege that a defaulting party was barred from terminating the Agreements under paragraph 2, nor does the Plaintiff allege that the parties were not within the term governed by paragraph 2. Accordingly, the Plaintiff's contention that the Defendant was barred from terminating the New Installation Agreement in October of 2011 based on the provisions of paragraph 25 cannot support its claim. Therefore, the Court finds that the Plaintiff has failed to state a claim for either a declaratory judgment or breach of contract on the ground that the Defendant breached the New Installation Agreement by terminating the Agreement in October of 2011.

Finally, the Court notes that the October Notice only references the termination of the New Installation Agreement, not the Extension Agreement. (Compl. ¶ Exh. 10.) The Defendant does not provide the Court with any basis to conclude that the October Notice, although not referencing the Extension Agreement, nevertheless applied to it. Thus, having found that the Plaintiff has plausibly alleged that the February Notice was ineffective with respect to the Extension Agreement, the Court finds that the Plaintiff has plausibly stated a claim that the Extension Agreement remains in effect.

**C. As to the Breach of the Implied Duty of Good Faith and Fair Dealing**

Although labeled "Breach of Contract", the Plaintiff's second cause of action primarily alleges that the Defendant breached the implied covenant of good faith and fair dealing by: (1) "failing and refusing to make sufficient efforts to enroll new members into the New Installation Program and to enroll members into the Extension Program"; (2) "by taking the Program 'in house' and creating a competing check-out display merchandising program"; and (3) "by using the know-how, business model and other Confidential Information of Dorset". (Compl., ¶ 121.)

In addition to the express terms of a contract, New York law implies in every contract a covenant of good faith and fair dealing "pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407 (2d Cir. 2006) (quoting M/A–COM Security Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990)). This covenant "'includes an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.'" Kader v. Paper Software Inc., 111 F.3d 337, 342 (2d Cir. 1997) (quoting Carvel Corp. v. Diversified Mgmt. Group, Inc., 930 F.2d 228, 230 (2d Cir.1991)).

Generally, a claim for breach of an implied covenant of good faith and fair dealing does not provide a cause of action separate from a breach of contract claim. "[P]arties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 80 (2d Cir. 2002) (citing Fasolino Foods Co., Inc., v. BancaNazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992)); see also L–7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 433 n. 17 (2d Cir. 2011) ("[B]reach of [the duty of good faith and fair dealing] is merely a breach of the underlying

contract.") (internal citations and quotations omitted)). So that a claim for breach of the covenant of good faith and fair dealing will be duplicative of a breach of contract claim where the claims are based on the same allegations or where the same conduct is the predicate for both claims. McGee v. State Farm Mut. Auto. Ins. Co., No. 09-CV-3579, 2011 WL 5409393, at *8 (E.D.N.Y. Nov. 8, 2011). However, a plaintiff "may bring two breach of contact claims, one based on breach of the express terms and the other based on breach of the implied duty, as long as they are supported by factually distinct allegations." Hosp. Auth. of Rockdale County v. GS Capital Partners V Fund, L.P., No. 09-CV-8716, 2011 WL 182066, at *4 (S.D.N.Y. Jan. 20, 2011).

The Plaintiff does not appear to dispute that its good faith and fair dealing claim based on the Defendant's alleged use of its confidential information is duplicative of its third cause of action for breach of the confidentiality and non-disclosure provisions of the Agreements. Thus, to the extent that the Plaintiff's claim for breach of the implied duty of good faith and fair dealing is premised on the Defendant's alleged use of the Plaintiff's confidential information to create the competing checkout program, that claim is dismissed. See Washington v. Kellwood Co., No. 05-CV-10034, 2009 WL 855652, at *6 n.3 (S.D.N.Y. Mar. 24, 2009) ("[A]lthough misappropriation of confidential information may give rise to a breach of the duties of good faith and fair dealing, this cannot be the case where, as here, the misappropriation of confidential information is already barred by an express contractual term.") (citing Konecranes v. Cranetech, Inc., No. 03-CV-6082, 2005 WL 246916, *3 (W.D.N.Y. Feb. 2, 2005)).

What remains is the Plaintiff's contention that, even assuming that the Defendant's alleged competing program did not rely on the Plaintiff's confidential information, the Defendant violated the implied covenant of good faith and fair dealing "by creating a competing check-out

display merchandising program," and soliciting members into that program, rather than the Dorset Program. The Defendant does not contend that these claims should be dismissed as duplicative, and the Court will not make such a determination *sua sponte*. Rather, the Defendant argues that the Plaintiff has failed to state a claim for breach of the implied covenant of good faith and fair dealing because the Plaintiff has not plausibly alleged the existence of the implied obligations.

In assessing the existence of an implied covenant, "[t]he boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." Cross & Cross Props., Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989). "The implied covenant of good faith encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included in the agreement . . . ." 1–10 Indus. Assoc. LLC v. Trim Corp. of Am., 297 A.D.2d 630, 631, 747 N.Y.S.2d 29 (2d Dep't 2002) (citations and internal quotation marks omitted).

However, it is well-settled that the covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not included by the parties." Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198–99 (2d Cir. 2005) (citation omitted); Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 980, 663 N.E.2d 289, 292 (1995) ("no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'") (quoting Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983)). In addition, a court may not construe the covenant to "undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990) (quoting Van

Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co., 30 N.Y.2d 34, 46, 330 N.Y.S.2d 329, 334, 281 N.E.2d 142, 145 (1972)).

"In determining whether a party has breached the obligation or covenant of good faith and fair dealing, a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties." Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc., 487 F.3d 89, 98 (2d Cir. 2007) (quoting 23 WILLISTON ON CONTRACTS § 63:22 (4th ed. 2006)). "Thus, whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." Id.; see also Janel World Trade, Ltd. v. World Logistics Servs., Inc., 2009 WL 735072 (S.D.N.Y. 2009) (denying motion to dismiss a claim for breach of the implied covenant of good faith and fair dealing because the conduct is an issue of fact).

### 1. Whether the Express Terms of the Contract Preclude Implied Obligations

The Defendant does not argue that the implied duties contradict the express terms of the Agreements. Rather, the Defendant primarily seeks the dismissal of this claim on the ground that it improperly imposes obligations on the Defendant that are not explicitly set forth in the Agreements. Specifically, the Defendant argues that "[h]ad the parties wished to impose a contractual duty on Unified to solicit the participation of its members, they easily could have included such a provision" and that "[n]othing in the Agreements granted Dorset an exclusive monopoly over checkout display programs generally or prohibited Unified from creating or using competing programs". (Def.'s Br. at 16, 17.)

The fact that the Agreements are silent on these issues is not necessarily fatal to the Plaintiff's claim because New York does not require that a breach of the duty of good faith and

fair dealing be tied to a specific contractual provision. See Havel v. Kelsey-Hayes Co., 83 A.D.2d 380, 445 N.Y.S.2d 333 (1st Dep't 1981) ("[T]hat a specific promise has not been expressly stated does not always mean that it was not intended."); see also Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A., 244 F.R.D. 204, 218 (S.D.N.Y. 2007) ("As the implied covenant of good faith and fair dealing could be interpreted to incorporate these duties without contradicting the express terms of the contract, the proper question is whether such implied terms are appropriate under the circumstances."). In the absence of a specific contractual provision underlying an implied obligation, "[a] party's actions may implicate the implied covenant of good faith when it acts so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties." See Bank of China v. Chan, 937 F.2d 780, 789 (2d Cir. 1991).

The Defendant also argues that the presence of a merger clause in the Agreements prevents the Court from inferring any obligations not expressly stated in the Agreements, or considering any course of dealing between the parties. As a general rule, "if a contract recites that all of the parties' agreements are merged into the written document, parol evidence is not admissible to vary, or permit escape from the terms of the integrated contract." Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993). However, as long as the implied term is consistent with other terms in the contract, "a merger clause does not prevent a court from inferring a covenant of good faith and fair dealing." SNS Bank, N.V. v. Citibank, N.A., 777 N.Y.S.2d 62, 65, 7 A.D.3d 352, 354–55 (1st Dep't 2004). "While independent obligations beyond those stated in the contract will not be inferred, a plaintiff adequately states an implied covenant claim by alleging conduct that subverts the contract's purpose without violating its express terms." JPMorgan Chase Bank, N.A. v. IDW Group, LLC, No. 08-CV-9116, 2009 WL

321222, at *7 (S.D.N.Y. Feb. 9, 2009). Thus, the fact that the Agreements contained a merger clause does not require the dismissal of the Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.

Finally, the Defendant cites to <u>Rowe v. Great Atlantic & Pac. Tea Co., Inc.</u>, 46 N.Y.2d 62, 69, 412 N.Y.S. 2d 827, 831, 385 N.E.2d 566, 570 (1978), for the proposition that "a party who asserts the existence of an implied-in-fact covenant bears a heavy burden, for it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists." Furthermore, the Defendant argues based on <u>Diasonics, Inc. v. Term, Inc.</u>, No. 85-CV-2621, 1988 WL 59961 (S.D.N.Y. June 10, 1988), a case that did not involve an implied covenant, that this burden is especially applicable to the instant case because the Agreements were "negotiated by a sophisticated commercial party like Dorset." (Def.'s Br. at 15.) However, both <u>Rowe</u> and <u>Diasonics</u> involved the plaintiff's burden of proof at trial, not on a motion to dismiss. At this stage, the Plaintiff must only plead enough facts to plausibly support its claim that the implied obligations are "so interwoven in the whole writing of the contracts as to be necessary for the effectuation of the purposes of the contracts." <u>JPMorgan Chase Bank</u>, 2009 WL 321222, at *7 (citation omitted).

As set forth below, the Court finds that the Plaintiff has plausibly alleged that the Agreements do not make contractual sense without the implication that Unified could not create a competing program and solicit members into the competing program instead of the Dorset Program.

## 2. Whether Dorset Plausibly Alleges the Existence and the Breach of Implied Obligations

The Plaintiff has plausibly alleged that it had the reasonable expectation that the Defendant would use its efforts to enroll members in the Program, rather than a competing

18

program.  The Plaintiff argues that "New York law imposed on Unified the obligation to make 'reasonable efforts' to enroll or solicit grocers into the Program," (Pl.'s Opp. at 15), and that, by soliciting members into its competing program rather than attempting to sign them up in either the New Installation or Extension Programs, the Defendant breached the duty of good faith and fair dealing.  (Id.).  While the Agreements do not expressly require the Defendant to use "reasonable efforts" to solicit its member grocers, such a duty does not conflict with the express terms of the Agreements, which the Plaintiff has sufficiently alleged give the Defendant the sole discretion to sign up members.

"Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 979, 663 N.E.2d 289, 291 (1995) (citing Tedeschi v. Wagner Coll., 49 N.Y.2d 652, 659, 427 N.Y.S.2d 760, 404 N.E.2d 1302 (1980)). "Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith." Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1575 (2d Cir. 1994); see Carvel Corp. v. Diversified Mgmt. Group, Inc., 930 F.2d 228, 231 (2d Cir. 1991); Cross & Cross Props., Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989).  "It is well-settled that, in construing discretionary promotional contracts, courts will not read into them a 'best efforts' or a 'promote fully' clause unless the parties have explicitly bargained for such an obligation." Travellers Int'l, A.G., 41 F.3d at 1575.  "However, even in a discretionary promotional contract, the obligation of good faith remains, and the particular duties of each party are 'derived both from the common expectations of [the] parties . . . and from the relationship of those parties as structured by the contract.'" Id. (quoting Zilg v. Prentice-Hall, Inc., 717 F.2d 671, 679 (2d Cir. 1983)).

The Defendant does not appear to dispute that it had the sole responsibility under the Agreements to solicit members to participate in the Program. Rather, the Defendant argues that the Agreements did not impose on it an "obligation" to sell the Program. According to the Defendant "rather than obligating Unified to 'sell' the programs to its members, the Agreements instead attempted to economically incentivize the Defendant by giving it a share of the revenues created by participation". (Def.'s Br. at 14.) However, a built-in economic incentive to "sell" the Program is not inconsistent with the Defendant's implied obligation to sell the Programs to its members.

As plead in the complaint, the structure of the relationship was such that, in order for either of the parties to profit, the Plaintiff had to enter into agreements with vendors, and the Defendant had to enter into agreements with retailers. Although the Plaintiff was the primary recipient of the revenue under the New Installation Agreement for the first three years, this arrangement shifted once retailers became enrolled in the Extension Program. The fact that the Agreements set forth this type of profit-sharing arrangement meant that the Plaintiff and the Defendant "had nothing to gain from the Agreement[s] if either failed to perform or gave minimal effort". BLD Prods., LLC v. Viacom, Inc., No. 10-CV-2625, 2011 WL 1327340, at *8 (S.D.N.Y. Mar. 31, 2011) (quoting B. Lewis Prods., Inc. v. Angelou, No. 01-CV-530, 2005 WL 1138474, at *10 (S.D.N.Y. May 12, 2005)). In such cases "courts 'must assume that each party arguably has an obligation to make "reasonable efforts" in furtherance of the Agreement in order to vindicate the "business efficacy" that both parties must have contemplated when they entered the Agreement." Id., 2011 WL 1327340, at * 7 (quoting B. Lewis Prods., Inc., 2005 WL 1138474, at *10).

Furthermore, the Plaintiff has plausibly alleged that the Defendant had a "duty not to engage in a competing checkout marketing display program by which Unified could divert revenue that would otherwise be payable to Dorset under the Program . . . ". (Pl.'s Opp. at 15.) To support this contention, the Plaintiff relies on Unified's role as an "intermediary signing up its member grocers into the Program". (Id.) In addition, the Plaintiff cites to provisions of the New Installation Agreement that granted the Plaintiff exclusive rights with respect to the Program. Specifically, paragraph 5 granted the Plaintiff "the exclusive right and authority to annually solicit and enter into agreements with distributors and/or manufacturers of various retail products . . . to participate in, continue to participate in, or to become new participants in, the Program", and paragraph 19 of the New Installation Agreement providing that the Plaintiff would be the sole and exclusive manufacturer of the equipment used in the Program.

The Plaintiff alleges that the parties included paragraph 19 relating to the Plaintiff's exclusive right to manufacture the displays "[t]o reinforce that only Dorset could manufacture, supply and design the checkout display units, and that Unified could not provide any competitive version of such display units to any member store . . . ". (Compl., ¶ 88.) By including this provision in the New Installation Agreement, the Plaintiff alleges that "the parties expressly intended that Unified could not employ either a competitive manufacturer, nor could Unified supply its own checkout counter displays, but rather was required to use the Plaintiff's services and, of course, to share with Dorset the revenue stream created by the Dorset displays and know-how, in accordance with the Agreements." (Id.)

Accepting these facts as true, the Plaintiff has sufficiently plead that, while the Plaintiff assumed the risk that the retailers would enter into separate contracts with its competitors, it did not assume the risk that the Defendant would "for [its] own self-interested reasons", offer a

competing program directly to the retailers.  <u>Gunthel v. Deutsche Bank AG</u>, 32 A.D.3d 335, 336, 821 N.Y.S.2d 160, 162 (1st Dep't 2006) ("A reasonable person in plaintiffs' position would have expected the plans' assets to be sold at fair market value.  While plaintiffs assumed the risk that the real estate market would go down, such that an investment would be sold at a loss, they did not assume the risk that defendants would, for their own self-interested reasons, sell an asset for less than half of fair market value"); <u>Wakefield v. N. Telecom, Inc.</u>, 769 F.2d 109, 112 (2d Cir. 1985) ("Where, however, a covenant of good faith is necessary to enable one party to receive the benefits promised for performance, it is implied by the law as necessary to effectuate the intent of the parties.").

Ultimately, the scope of these duties, and what obligations or restrictions the Agreements may have placed on the Defendant with regard to its dealings with member grocers, including those who declined to participate in the Program, are issues of fact inappropriate for resolution at this stage in the proceedings.  Under the law, the Plaintiff was entitled to expect that the Defendant would not act to destroy its rights to enjoy the fruits of its contract.  Accepting the facts in the complaint as true, and drawing all inferences in favor of the Plaintiff, the Plaintiff has sufficiently pled that the Defendant's conduct in creating a competing checkout program, and soliciting its members into that program instead of the Dorset Program, deprived the Plaintiff of the benefits of the Agreements, and therefore violated the implied covenant of good faith and fair dealing.  <u>See</u> <u>Butvin v. DoubleClick, Inc.</u>, No. 99-CV-4727, 2001 WL 228121, at *8 (S.D.N.Y. Mar.7, 2001) ("New York courts have recognized a separate cause of action for breach of the covenant of good faith and fair dealing, however, in cases involving efforts by one party to a contract to subvert the contract itself."); <u>see</u> <u>also</u> <u>JPMorgan Chase Bank, N.A. v. IDW Group, LLC</u>, No. 08-CV-9116, 2009 WL 321222, at *7 (S.D.N.Y. Feb. 9, 2009) (denying motion to

dismiss implied covenant claim where the plaintiff adequately alleged that the defendant "deprived it of the benefits of the Agreements") (internal quotation marks and citation omitted).

**D.  Breach of Confidentiality and Non-Disclosure Provisions**

The Plaintiff's third cause of action asserts that the Defendant breached the confidentiality and non-disclosure provisions of the Agreements by misappropriating its confidential information and trade secrets to create a competing checkout display program.  The Agreements in this case specifically state that "any information provided by [Dorset] of any kind, nature or description concerning the methods or procedures of conducting the business of [Dorset] or any matter whatsoever affecting or relating to the business of [Dorset] [is] important, material and confidential [and] critically affects the successful conduct of the business of Supplier," and that, the Defendant's 'use or divul[gence]' or such information 'shall constitute a material breach of the Agreement.' "  (NIPA, ¶ 21(b); EPA, ¶ 14(b).)  Furthermore, the obligations in these provisions explicitly extend beyond the termination of the Agreements.  The Plaintiff alleges that it would not have entered into the Agreements without these provisions, and that they were "material and central to Dorset agreeing to create, design and manage the Program for Unified."  (Compl., ¶ 84.)

The Defendant contends that the Plaintiff has failed to sufficiently plead that it breached the confidentiality and non-disclosure provisions because:  (1) the Plaintiff has not identified any confidential information allegedly used by the Defendant in the creation of the competing checkout program, or, that such information was "confidential"; and (2) the Plaintiff does not adequately allege that the Defendant misappropriated any confidential information.  The Court disagrees.

To state a claim for misappropriation of a trade secret or confidential information, a plaintiff must show: "(1) that it possessed a trade secret [or confidential information], and (2) that the defendants used that trade secret [or confidential information] in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." Faiveley Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 117 (2d Cir. 2009) (quoting N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43–44 (2d Cir. 1999)).  Under New York law, "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 174 (2d Cir. 1990) (citation omitted).

The Second Circuit has identified the following six factors for courts to consider in determining whether certain information constitutes a trade secret:  "(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Haber, 188 F.3d at 44 (internal quotation marks and citation omitted).  "A trade secret 'differs from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of the business [but rather] is a process or device for continuous use in the operation of the business.'" Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp. 2d 283, 305 (S.D.N.Y. 2005) (quoting Restatement (First) of Torts § 757 cmt.

b.); <u>Lehman v. Dow Jones & Co.</u>, 783 F.2d 285, 298 (2d Cir. 1986) (holding that a trade secret is information "used in running the business . . . like the formulas or processes used in manufacturing").

Here, the Plaintiff has set forth facts plausibly alleging that the information allegedly utilized by the Defendant constituted "confidential information" and/or "trade secrets." In the complaint, the Plaintiff identifies the alleged confidential information as "checkout counter programs and its business model, plan-o-grams and designs, methods and procedures . . . including creating and designing the specific Program for Unified." (Compl., ¶ 85.) In addition, the Plaintiff alleges that: it "has taken reasonable efforts to guard the secrecy of such information" by "restrict[ing] access to certain information even within the company, using password protected computer systems and limiting remote access to those with authority, and limiting access to documents containing Confidential Information within Dorset". Also, it has done so by requiring Unified and other Dorset customers, "to execute a Confidentiality and Non-Disclosure Agreement . . . which defines such confidential and proprietary information and which contains several express restrictive covenants, including specific covenants of non-disclosure of trade secrets and confidential and proprietary information". (Compl., ¶¶ 130–32.) Finally, the Plaintiff alleges that it "has spent tens of thousands of dollars in implementing these safeguards" in order to protect this information and that it believed this expenditure was justified because this Confidential Information would be worth millions of dollars to Unified and Dorset's competitors, who could not readily acquire or duplicate this information, which has taken Dorset decades to obtain and/or create. (Compl., ¶ 134.)

Accepting these allegations as true, the complaint is sufficiently specific at this stage to support the Plaintiff's claim that the information allegedly misappropriated was "confidential" or

a "trade secret."  The cases cited by the Defendant for the proposition that a greater level of specificity is required at the pleading stage for "types of 'Confidential Information' " (Def.'s Br. at 21), are not only distinguishable, but in certain cases, arguably misleading.  See Sedona Corp. v. Ladenburg Thalmann & Co., Inc., No. 03-CV-3120, 2009 WL 1492196 (S.D.N.Y. May 27, 2009) (involving conclusory pleading of breach of contract claims generally, not conclusory pleading of trade secret or confidential information); Sit-Up Ltd. v. IAC/InterActiveCorp., No. 05-CV-9292, 2008 WL 463884, at *10 (S.D.N.Y. Feb. 20, 2008) (involving the level of specificity required on a *summary judgment* motion, not a motion to dismiss,  "to demonstrate not only that its trade secret is in theory protectable, but also in fact worthy of protection"); Am. Petroleum Inst. v. Technomedia Int'l, Inc., 699 F. Supp. 2d 258, 265 n.5 (D.D.C. 2010) (holding that the plaintiff insufficiently pled the existence of trade secrets where the allegation in the complaint was "nearly identical" to the definition of a trade secret in the D.C. Code).

Similarly without merit is the Defendant's contention that the Plaintiff does not allege facts from which the Court can plausibly infer that the confidentiality provisions were violated. (Def.'s Br. at 19 ("Dorset admits that it does not even know whether Unified has actually used or disclosed any confidential information, or whether it is merely speculating that it *might* do so at some unspecific future date.").)  Specifically, the Defendant argues that, at most, the Plaintiff has alleged that it misappropriated a single form used for entering into agreements with vendors, and that this form does not constitute confidential information or a trade secret because it is "a one page-five line form which does nothing more than record basic information, including the date, the name of the vendor company and its representative, and the agreed-upon charge."  (Def.'s Br. at 21.)  Again, the Court disagrees.

First, the Plaintiff cites this form not for its content, but for the inference that the Defendant created a checkout program that utilized the same methods and procedures as the Dorset Program. This inference is supported by the fact that the only difference between the form used by the Plaintiff and the form used by the Defendant is that the Defendant's form removes the sentence instructing vendors to remit payment to Dorset. (<u>Compare</u> Compl., Ex. 11 (Unified Program form) <u>with</u> Compl., Ex. 12 (Dorset Program form).) Moreover, the Plaintiff does not rely solely on the similar form to support its claim that the Defendant has misappropriated its confidential information to create the competing checkout program.

Rather, the Plaintiff also alleges that the Defendant expressly informed the Plaintiff that it intended to take over the Dorset Program based on its observation of how the Plaintiff operated the Program for the previous ten years. (<u>See</u> Compl., ¶ 74.) In addition, the Plaintiff alleges that the Defendant stated that it had already identified customers for its competing program, and that the subsequent decline in new customers compared to previous years implies that the Defendant began enrolling customers into the competing program while the Agreements were still in effect. (Compl., ¶¶ 75–77, 92–94.) A reasonable inference from these allegations is that the Defendant was creating a checkout display program that would replicate the allegedly confidential "methods or procedures" used in operating the Dorset Program.

Thus, taken together, the Plaintiff plausibly alleges that the Defendant used its confidential information and/or trade secrets to create and implement a checkout display program in breach of the confidentiality and non-disclosure provisions of the Agreements. Again, the cases cited by Unified to support the contention that a greater level of specificity is required at this stage are inapplicable. See <u>All Business Solutions, Inc. v. NationsLine, Inc.</u>, 629 F. Supp. 2d 553, 558–559 (W.D.Va. 2009) (dismissing a misappropriation of trade secrets claim where

the plaintiff alleged a "single, conclusory assertion that [the defendant] 'sought . . . to appropriate and disclose the names of [the plaintiff's] customers, along with other [of the plaintiff's] trade secrets and confidential information" and "no additional factual allegations."); <u>Medafor, Inc. v. Starch Medical Inc.</u>, No. 09-Cv-441, 2009 WL 2163580, at *1 (D. Minn. July 16, 2009) (dismissing claims for breach of a confidentiality provision in a contract based on misappropriation of trade secrets where the plaintiff "failed to plead any facts to support its allegation that [the defendant] stole its trade secrets" beyond the single fact that the plaintiff's former employee was now working for the defendant); <u>Accenture Global Servs. GMBH v. Guidewire Software Inc.</u>, 581 F. Supp. 2d 654, 663, 663 n.9 (D. Del. 2008) (dismissing claim for misappropriation of trade secrets despite the fact that the plaintiff's "basic description of the nature of its trade secrets [was] sufficient" because the plaintiff had only alleged that, based on a set of circumstances, it "assume[d] . . . that [the defendant] ha[d] 'somehow' obtained and used [the plaintiff's] trade secrets"); <u>see</u> <u>id.</u> at 663 n.9 (citing <u>Orthovita, Inc. v. Erbe</u>, No. Civ. A. 07-2395, 2008 WL 423446 at *9 (E.D.Pa. Feb. 14, 2008), for the proposition that "[A] plaintiff pleading misappropriation of a trade secret need not plead the details of its trade secrets in a publicly filed complaint, inasmuch as such disclosure would destroy the essential 'secrecy' of the claimed trade secret"); <u>Knights Armament Co. v. Optical Sys. Tech., Inc.</u>, 568 F. Supp. 2d 1369, 1377 (M.D. Fla. 2008) (dismissing misappropriation of trade secrets counter-claim where, other than stating that the defendants had "access to trade secrets through business dealings," the counter-claim plaintiff "gave no further details as to how the [defendants] allegedly used the trade secrets" but rather gave "a formulaic recitation of the elements of a cause of action").

Accordingly, the Defendant's motion to dismiss the third cause of action for breach of the confidentiality and non-disclosure provisions of the Agreements is denied.

**E.  As to the Claims for Unfair Competition and Usurpation of Corporate Opportunities**

In addition to the contract claims, the Plaintiff's fourth and fifth causes of action seeks damages in tort under the theories of unfair competition and usurpation of corporate opportunities.

As an initial matter, the Court agrees with the Defendant that the Plaintiff's fifth cause of action for usurpation of corporate opportunities is subject to dismissal because this claim is not applicable to the facts of this case.  The doctrine of "corporate opportunity" is "based on a duty of loyalty to an employer" and provides that "corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation."  Design Strategies, Inc. v. Davis, 384 F. Supp. 2d 649, 672 (S.D.N.Y 2005) (quoting Alexander & Alexander of New York, Inc. v. Fritzen, 542 N.Y.S.2d 530, 533 (1st Dep't 1989)).  Even accepting the Plaintiff's argument that the parties were "partners" or "co-venturers", the nature of their relationship is not the type that would support a claim under this legal theory because this cause of action is applicable to fiduciaries and employees within the same corporate entity, not to parties engaged in a mutually beneficial business venture.

The Plaintiff cites to Barbaro v. Spinelli, No. Civ. 09-100155, 2009 N.Y. Misc. LEXIS 5240 at 8-9, 2009 Slip Op 32106U (S. Ct. Richmond Co. Sept. 10, 2009) for the proposition that "co-venturers" can usurp corporate opportunity, and therefore a fiduciary duty is not an element of a claim for usurpation of corporate opportunity.  Not only does Barbaro not stand for this proposition, it actually supports the Defendant's position that the relationship between the parties could not give rise to a usurpation claim.  The dispute between the parties in Barbaro arose from a joint venture agreement, where the parties jointly formed a corporate entity, and the plaintiffs

alleged that the defendants created a competing venture, in violation of a non-competition clause, that usurped corporate opportunities from the corporate entity. Thus, in <u>Barbaro</u>, the parties were similarly situated to the parties in a typical factual setting of a usurpation claim, namely as corporate fiduciaries or employees of a single corporate entity.

By contrast, in this case, there was no formation of an independent corporate entity or joint-venture. Accordingly, because the Court finds that the Plaintiff has failed to plead the existence of a plausible usurpation of corporate opportunities claim, the Court grants the Defendant's motion to dismiss this cause of action.

With respect to the claim for unfair competition, the Defendant contends that it is subject to dismissal because it is duplicative of the breach of contract claims. For its part, the Plaintiff does not dispute that its unfair competition claim is duplicative of its contract claims. Nevertheless, the Plaintiff alleges that its unfair competition claim is not subject to dismissal because it is pled in the alternative.

As a general matter, "[w]here the plaintiff and defendant are parties to a contract, and the plaintiff seeks to hold the defendant liable in tort, the plaintiff must prove that the defendant breached a duty "independent" of its duties under the contract; otherwise plaintiff is limited to an action in contract." <u>Carvel Corp. v. Noonan</u>, 350 F.3d 6, 16 (2d Cir. 2003) (citing <u>Clark-Fitzpatrick Inc. v. Long Island R.R. Co.</u>, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987); <u>Apple Records, Inc. v. Capitol Records, Inc.</u>, 137 A.D.2d 50, 529 N.Y.S.2d 279 (1st Dep't 1988)). This concept is equally applicable where, as here, the unfair competition claim is also premised on the same factual allegations underlying a claim for breach of the duty of good faith and fair dealing. <u>See</u> <u>Orange County Choppers, Inc. v. Olaes Enters., Inc.</u>, 497 F. Supp. 2d 541, 558 (S.D.N.Y.2007) ("It is well-settled, however, that no claim [for unfair competition] lies

where its underlying allegations are merely a restatement, albeit in slightly different language, of the implied contractual obligations asserted in the cause of action for breach of contract.") (internal citations omitted); <u>Washington v. Kellwood Co.</u>, No. 05-CV-10034, 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24, 2009) ("Plaintiffs' basis for a claim of common law unfair competition is that Defendant misappropriated confidential information for the purpose of marketing and selling its own products. However, like their claim for breach of the duty of good faith and fair dealing. Plaintiffs' unfair competition claim is merely duplicative of their breach of contract claims.").

In the allegations underlying the unfair competition claim in complaint, the Plaintiff does not allege that the Defendant had an independent legal duty other than its duty to comply with its express and implied obligations under the Agreements. Thus, the Plaintiff has not plead an "alternative theory" under which it could recover separate and apart from the breach of contract claims, and therefore the unfair competition claim must be dismissed as duplicative of the breach of contract claims.

As a final matter, the Court notes that, in opposing the motion to dismiss the usurpation of corporate opportunities claim, the Plaintiff contends that the allegations in the complaint that the Defendant's head of marketing referred to the parties' relationship as a "partnership" plausibly support the existence of a fiduciary relationship. It is well-settled that, "[u]nder New York law, partners owe each other a fiduciary duty". <u>Le Bel v. Donovan</u>, 96 A.D.3d 415, 417, 945 N.Y.S.2d 669, 671 (1st Dep't 2012). Thus, although the Court finds that the Plaintiff's claim for unfair competition as currently pled should be dismissed, a question remains as to whether that dismissal should be with or without prejudice to renew based on a theory that the

Defendant owed the Plaintiff a fiduciary duty. As set forth below, the Court finds that permitting the Plaintiff to amend the complaint to assert the existence of such a duty would be futile.

The Defendant argues, and the Court agrees, that the Plaintiff is foreclosed from asserting the existence of a fiduciary relationship by the plain language of the Agreements, which state in relevant part:

> No Agency. [Dorset] and [Unified] are not, and shall not be considered as joint ventured, partners, agents, servants, or employees, or fiduciaries of each other, and neither shall have the power to bind or obligate the other.

(NIPA, ¶ 24; EPA, ¶ 16.) "It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed." Wallace v. 600 Partners Co., 86 N.Y.2d 543, 548, 634 N.Y.S.2d 669, 671, 658 N.E.2d 715, 717 (1995) (internal quotation marks omitted).

Courts frequently dismiss claims for breach of fiduciary duty based on this type of "clear and unambiguous disclaimer of a fiduciary relationship" in the parties' contractual agreements. BNP Paribas Mortg. Corp. v. Bank of Am., N.A., No. 09-CV-9783, 2012 WL 2026063, at *9 (S.D.N.Y. June 5, 2012); Summit Props. Int'l, LLC v. Ladies Prof'l Golf Ass'n, No. Civ. 07-10407, 2010 WL 2382405, at *7 (S.D.N.Y. June 14, 2010) ("Given that the Agreement contains a clear and unambiguous disclaimer of a fiduciary relationship, we find there was no fiduciary duty between the parties."); Seippel v. Jenkens & Gilchrist, P.C., 341 F. Supp. 2d 363, 381–82 (S.D.N.Y.2004) (finding that "[b]ecause contractual disclaimers of fiduciary duty are effective in New York, no fiduciary duty can arise from the relationship between the [Plaintiff] and Deutsche Bank"); Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ., 944 F. Supp. 1169, 1178 (S.D.N.Y. 1996) (holding that no fiduciary relationship existed where the agreement "clearly and unambiguously disclaims a fiduciary relationship").

"Even putting aside the contractual disclaimer of a fiduciary relationship, for a fiduciary relationship to exist, a party must repose confidence in another and reasonably rely on the other's superior expertise or knowledge." <u>BNP Paribas Mortg. Corp.,</u> 2012 WL 2026063 at *10. Here, the Plaintiff alleges that it relied on the Defendant's express and implied obligations under the Agreements, not on any "superior expertise or knowledge". Furthermore, the Program was created through an arms-length business transaction, which does not give rise to a fiduciary obligation. <u>See</u> <u>Wiener v. Lazard Freres & Co</u>. 241 A.D.2d 114, 672 N.Y.S.2d 8, 14 (1st Dep't 1998). The fact that the parties' interests were aligned in effectuating the Program does not mean the relationship was of a fiduciary nature. Based on the explicit waiver in the Agreements, and the nature of the parties' relationship, the Court concludes that it would be futile to permit the Plaintiff to amend the complaint to assert the existence of a fiduciary duty.

### III. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the Defendant's motion to dismiss the Plaintiff's first cause of action for a declaratory judgment claim is granted in part and denied in part, and it is further

**ORDERED**, that the Defendants' motion to dismiss the Plaintiff's second cause of action for breach of the implied covenant of good faith and fair dealing is granted in part and denied in part, and it is further

**ORDERED**, that the Defendant's motion to dismiss the Plaintiff's third cause of action for breach of contract is denied, and it is further

**ORDERED**, that the Defendant's motion to dismiss the Plaintiff's fourth cause of action for unfair competition claim is granted, and it is further

**ORDERED**, that the Defendant's motion to dismiss the Plaintiff's fifth cause of action

for usurpation of opportunities is granted.


**SO ORDERED.**
Dated: Central Islip, New York
September 27, 2012


___/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge